**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SHELIA K. THOMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:07-cv-0175** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **COMMISSIONER OF SOCIAL SECURITY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Sheila Thompson's Motion for Judgment on the Administrative Record (Doc. No. 13) and supporting memorandum (Doc. No. 14) seeking judicial review of the Commissioner's denial of her claim for Supplemental Security Income ("SSI"). For the reasons explained below, the Court finds that the ALJ's decision is supported by substantial evidence in the record, and that the ALJ applied the correct legal principles in reaching his decision. Accordingly, the Plaintiff's motion will be denied, the Commissioner's decision affirmed, and this matter dismissed.

**I.     INTRODUCTION**

The Plaintiff filed her first application for SSI on October 17, 2000, alleging that she had become disabled on October 15, 1989. (*See* Doc. No. 5, Certified Transcript of Administrative Record ("TR"), at 63-66, 73.). After her claim was denied initially, and again upon reconsideration, she requested, and was granted, a de novo hearing by an administrative law judge ("ALJ") (TR 43.). The Plaintiff then appeared, with counsel, before ALJ John P. Garner (TR 9-12.). In a decision dated June 23, 2003, the ALJ denied her application for benefits (Id.). Plaintiff thereafter filed a timely request for review by the Appeals Council, and on February 27, 2004, the Appeals Council remanded the case to the ALJ to consider new evidence (TR 308-11.).

On August 26, 2005, after a second administrative hearing based on the aforementioned new evidence, the ALJ again denied the Plaintiff's claim (TR 22-30.). The Appeals Council denied review on December 12, 2006. Thereafter the ALJ's decision became the final decision of the Commissioner, from which the Plaintiff's appeal thus arises pursuant to 42 U.S.C. §§ 405(g) and 13183(c)(3) (TR 9-12.).

II.     **THE FACTUAL RECORD**

A.     **Background**

Plaintiff was born June 20, 1954, and was thirty-five years old (a "younger individual") on her alleged onset date ("AOD") of October 15, 1989.  She turned forty-six in October of 2000, her SSI application month (TR 30.), and fifty years old ("closely approaching advanced age") on August 26, 2005 (TR 64.), the date of the second administrative hearing.  *See* 20 C.F.R. §§ 404.1563, 404.1564, and 404.1565 (classifying individuals according to their age, education and work experience).  *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.  Plaintiff has a high school education and no relevant work experience. 20 C.F.R. § 404.1565(a)(3).  (TR 29, 79, 611, 629, 713.)  Plaintiff claims she became disabled in October, 1989 when she began experiencing daily back pain (TR 611, 629-30.).  Plaintiff is 5-feet 3-inches tall, and, at the time of the occurrence of disability, weighed 167 pounds (TR 628.).

B.     **Plaintiff's Testimony**

Plaintiff has stated that she had constant back pain, except at night when she took sleep medication (TR 630.).  She stated that trigger-point injections relieved the pain symptoms for two or three days and that physical therapy did not help (TR 633, 643).  Plaintiff also stated that she had carpal tunnel pain and that wearing wrist splints when she slept helped to relieve those symptoms (TR 632.).  She also stated that she had had surgery on both knees, but that they were in "good" condition (TR 644.).  Plaintiff said that she took medication "to calm [her] nerves" (TR 642.).  Plaintiff's medications included Percocet and methadone once a day for pain, Celebrex and Avinza for pain, lisinopril and HCTZ for hypertension, and Paxil for depression (TR 332.).  Plaintiff alleged that these medications reduced her pain, but also caused sleepiness and dizziness (TR 633.).  Plaintiff testified that she could lift ten pounds, stand for two hours, and sit for two hours (TR 635-37.).  Regarding her daily activities, Plaintiff indicated that she was able to ride a bus, do crossword puzzles, shop for groceries with a relative, attend church twice a month, and visit with relatives (TR 639-42.) On April 30, 2001, Plaintiff completed a pain questionnaire that indicated her daily activities included mopping, sweeping, cooking, hanging out laundry, and walking to the mail box (TR 106.).  Plaintiff also stated that she took pain medication three times a day without side effects (TR 105.).

C.     The Medical Evidence

1.     *1999*

On October 11, 1999, Plaintiff was hospitalized for four days at Metropolitan Nashville General Hospital for treatment of severe anemia (TR 263–85.). She received a blood transfusion and was discharged with iron supplements (TR 265.).

2.     *2000*

On March 2, 2000, Plaintiff received treatment at Matthew Walker Health Center for complaints of right-sided pain that went down to the knee (TR 116.).    X-rays of the right knee showed "early osteoarthritis" (TR 117.).

On July 2, 2000, the health center treated Plaintiff's complaints of low back pain with anti-inflammatory medication (TR 113.).   A straight leg raising test was negative.    (*Id.*)   On July 31, 2000, William L. Bacon, M.D., an orthopedic surgeon, examined Plaintiff and diagnosed thoracic back pain with muscle tenderness and full range of motion in the spine (TR 219.).   Lumbosacral x-rays showed no changes from previous x-rays, but there were signs of osteopenia (TR 218.).

During August 2000, Plaintiff had six physical therapy sessions for treatment of thoracic back pain (TR 184-204.).   The therapist concluded that Plaintiff had "intermittent" back pain that was "mechanic[al] in nature" (TR 184.).   The therapist indicated that the source of the Plaintiff's back pain was largely related to her posture, and determined that the majority of the pain could be ameliorated or relieved through improved posture and exercise.

On September 21, 2000, an MRI of the left knee showed a "severely degenerated and torn" medial meniscus, but "minimal" joint effusion and "mild" osteoarthritis (TR 181-182.). An MRI of the lumbar spine disclosed "mild" degenerative disc disease, but no disc bulges or protrusions (TR 215-216.).

October 2, 2000, Plaintiff received medication treatment for thoracic spinal pain, and was referred for an orthopedic consultation (TR 112.).   On October 23, 2000, Dr. Bacon diagnosed low back pain with "mild" degenerative disc disease and reported a negative straight leg raising test (SLR) (TR 214.).

On November 9, 2000, the results of a bone scan of the right knee showed "mild" osteoarthritis (TR 179-180.).

On December 19, 2000, Donita Keown, M.D., a consulting physician, examined Plaintiff and noted a "mild scoliotic" curvature of the spine (TR 139-140). Plaintiff had no gait or walking abnormalities, and the ranges of motion of the spine and knees were normal (TR 139.). Neurological tests and a straight leg raising test were normal. (*Id.*) The grip strengths of Plaintiff's hands were normal. (*Id.*) Dr. Keown concluded that Plaintiff was able to sit for six hours a day, stand or walk for six hours a day, frequently lift ten pounds, and lift a maximum of twenty pounds (TR 140.).

### 3.    2001

On January 12, 2001, Plaintiff had arthroscopic knee surgery for removal of a torn meniscus in the left knee (TR 165-166.). Two weeks later, Plaintiff began physical therapy and, according to the doctors, she regained normal full weight bearing capacity within four weeks (TR 150-164.).

On February 13, 2001, George W. Bounds, M.D., a State agency medical consultant, reviewed the medical records and completed an assessment of Plaintiff's residual functional capacity (RFC) (TR 141-148.). Dr. Bounds concluded that Plaintiff had the physical capacity to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk a total of about six hours in an eight-hour day, sit for a total of about six hours in an eight-hour day, and operate foot or hand controls without restrictions (TR 142.). Postural limitations restricted Plaintiff to occasional kneeling, crouching, crawling, and stair climbing (TR 143.). On February 29, 2001, Dr. Bacon diagnosed "mild" degenerative disc disease at the L3–L4 level (TR 207.).

On April 12, 2001, Dr. Bacon reported that the results of a spinal bone scan were normal and diagnosed a bulging disc at the L3–L4 level (TR 206.). A physical examination revealed full range of motion in the left knee and no joint effusion. (*Id.*) Dr. Bacon recommended continued physical therapy for the complaints of spinal pain and strengthening exercises for the left knee. (*Id.*) Through the remainder of 2001, Plaintiff had monthly appointments at the health center for treatment (TR 244-55.).

### 4.    2002

On January 24, 2002, health center progress notes reported that Plaintiff had full range of motion of the spine and a negative straight leg raising test (TR 241.). Her hypertension was controlled by medication and she was referred for pain management. (*Id.*) Plaintiff reported that she was able to cook meals and go shopping (TR 242.).

On March 6, 2002, Plaintiff was prescribed a splint for the left wrist, but progress notes indicated that the findings of a physical examination were "disproportionate" to the severity of her complaints (TR 238.). Plaintiff again reported that she was able to cook meals and go shopping (TR 239.).

On April 21, 2002, a physical examination by Ralph S. Hobbs, M.D., revealed "moderate" tenderness in the lumbosacral spine with positive trigger points and a positive straight leg raising test. (*Id.*) Dr. Hobbs diagnosed radiculopathy and recommended treatment with trigger point injections. (*Id.*)

On May 1, Plaintiff complained of left hand pain, but the results of nerve conduction studies (NCV) for carpal tunnel syndrome were negative (TR 234.). Plaintiff reported that treatment at the pain clinic "tremendously" reduced her lower back pain. (*Id.*) On May 13, Dr. Hobbs reported Plaintiff's pain symptoms significantly improved without side effects (TR 224, 226.). A physical examination revealed a positive left straight leg raising test and full range of motion of the lumbosacral spine (TR 226.).

On June 10, July 17, October 16, November 18, and December 18, 2002, Plaintiff received trigger point injections (TR 222, 409, 411, 415.). Dr. Hobbs noted that Plaintiff did not have side effects and that improvement in her symptoms allowed her to do daily activities (TR 409, 411, 415.).

### 5. *2003*

On January 9, 2003, Dr. Hobbs reported that Plaintiff had hypertension, chronic low back pain with radiculopathy, and degenerative joint disease of the knees (TR 287.). He opined that Plaintiff was able to sit for less than two hours, stand for less than two hours, walk for one or two blocks, and lift a maximum of ten pounds (TR 288-89.). Daily chronic pain required her to walk around every thirty minutes (TR 287-88.). She had to elevate her legs for thirty-three percent of an eight hour day, and needed fifteen to twenty minute rest breaks every hour (TR 288.).

On March 24, April 22, May 20, and June 18, 2003, Plaintiff received trigger point injections at the pain clinic (TR 393, 396, 399, 401.). On March 24 only, Plaintiff reported few side effects from the treatments and her pain symptoms improved. (*Id.*) Physical examination results were unchanged. (*Id.*)

As of June 19, 2003, Plaintiff had a gained weight and, at 213 pounds, was considered clinically obese. . She complained of left-sided abdominal pain (TR 354.). The results of CT scans of the abdomen and pelvis were normal (TR 340.). On June 29, and July 1, 2003, Plaintiff received emergency outpatient treatment at Baptist Hospital for complaints of low back pain (TR 426-446.).

### 6. 2004

Health center progress notes indicated that, on January 13, 2004, Plaintiff continued to complain of left-sided pain and that Dr. Hobbs had prescribed medication for depression (TR 501.).

On June 15, 2004, Plaintiff complained of pain in the right knee that lasted for three weeks (TR 498.). A physical examination revealed "mild" swelling and crepitus in the knee. (*Id.*) On July 26, 2004, Thomas Limbird, M.D., evaluated Plaintiff's complaints of weakness in the right knee and diagnosed an unstable tear of the medial meniscus that required surgery (Tr. 579). X-rays revealed "moderately significant" degenerative changes in the right knee (Tr. 580).

On August 17, 2004, Dr. Limbird performed arthroscopic surgery on the right knee to partially remove the meniscus (TR 574-75.). One week later, Plaintiff was referred for physical therapy (TR 573.).

### 7. 2005

On January 27, 2005, Plaintiff complained of low energy and a poor appetite (TR 488.). The health center noted that these symptoms were side effects of pain medication and made adjustments in her prescriptions. (*Id.*) Hypertension was also diagnosed.

On February 18, 2005, Dr. Hobbs reported Plaintiff was able to sit, stand, or walk for less than two hours, and for less than one block at a time, and was unable to lift objects weighing less than ten pounds (TR 484-85.). Major depression prevented her from performing low stress jobs (TR 484.). She had to shift positions at will and walk around every thirty minutes. (*Id.*) She had to elevate her legs and use a cane to walk, and needed five- to ten-minute breaks every two hours. (*Id.*) She also was limited in her ability to reach in all directions (TR 486.).

Health center notes dated August 19, 2005 show Plaintiff complained of headaches after she did not take blood pressure medication for two months (TR 590.). Her blood pressure measured 151/90 and she was diagnosed with uncontrolled hypertension due to non-compliance with medication. (*Id.*)

On September 19, 2005, Plaintiff was unable to do leg raises during a physical examination due to pain in the left knee, but no other joint abnormalities were observed (TR 587.). X-rays of the lumbosacral spine and left knee revealed "mild osteoarthritis" in the knee (TR 597.). Plaintiff's anti-inflammatory medication was adjusted and she reported "some" improvement in the knee pain (TR 583.). Injections at the pain clinic continued to help her symptoms of back pain. (*Id.*)

**III.     THE ALJ'S August 26, 2005 DECISION**

Based on his review of the entire record, ALJ John P. Garner made the following findings in the written opinion issued on August 26, 2005:

1.     The claimant had not engaged in substantial activity since October 17, 2000.

2.     The claimant has the following "severe" impairment:  degenerative disc disease.

3.     This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4

4.     The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.     The claimant has the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally; stand for a total of about 6 hours in an 8 hour day; stand and/or walk for a total of about 6 hours in an 8 hour day; occasionally climb ramps/stairs, kneel, crouch, or crawl; frequently balance, stoop, push, pull, or reach.

6.     The claimant has no vocationally relevant past work (20 CFR § 416.965.).

7.     On October 17, 2000, the claimant was a younger individual.  As of June 20, 2004, at age 50, she is an individual closely approaching advanced age (20 CFR § 416.963.)

8.     The claimant has a high school education. (20 CFR § 416.964.)

9.     Considering the claimant's external limitations, age, education, and work experience, there are a significant number of jobs in the national economy that she could perform as identified by the vocational expert; a finding of "not disabled" is therefore directed by Medical-Vocational Rules 202.20 and 202.13.

10.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision.  20 CFR 404. 1520(g). (TR  25–26.)

**IV.     STANDARD OF REVIEW**

**A.     Standard of Review**

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion.  *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d

244, 246 (6th Cir. 1995). Conversely, however, the Court must reverse and remand for further findings if the ALJ applied incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different. *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545, 546 (6th Cir. 2004). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantiality is based on the record taken as a whole. *See Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984). When there has been a misapplication of the regulations or when there is not substantial evidence to support one of the ALJ's factual findings, the appropriate remedy is generally remand under sentence four of 42 U.S.C. § 405(g) for further consideration. *See Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

      **B.**     **Evaluation of Entitlement to Social Security Benefits**

      Under the Social Security Act (the "Act"), a claimant is entitled to receive benefits only if he is deemed "disabled." 42 U.S.C. § 423(d)(1)(A). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

      In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. *See id.* The Sixth Circuit has summarized the steps as follows:

    1. If claimant is doing substantial gainful activity, he is not disabled.

    2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

    3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

    4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

    5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    ANALYSIS AND DISCUSSION

In the "Statement of Errors" section of her brief, Plaintiff makes seven discrete arguments in support of her Motion for Judgment on the Administrative Record:  (1) the ALJ's hypothetical question was inaccurate and incomplete; (2) the ALJ erroneously evaluated Thompson's depression; (3) the ALJ failed to evaluate adequately Thompson's obesity; (4) the ALJ erroneously relied on medical opinions rendered in 2000 and 2001 for the entire period adjudicated; (5) the ALJ erroneously rejected treating pain specialist Dr. Hobbs' opinions; (6) the ALJ erred in evaluating the side effects of Thompson's medication; and (7) the ALJ improperly utilized the vocational expert to determine Thompson's residual functional capacity.  The Court will consider each of these enumerated arguments in turn, but will consider together the first and seventh arguments, the fourth and fifth arguments, and the second and third arguments, respectively, in tandem.

### A.  Whether the ALJ's Hypothetical Question was inaccurate and incomplete, and if the ALJ properly utilized the vocational expert to determine Thompson's residual functional capacity.

The Plaintiff asserts that the ALJ's hypothetical question posed to the vocational-expert (VE) during the Plaintiff's second hearing was "inaccurate and incomplete" (Motion at 7.), and, as such, the ALJ was therefore not entitled to rely upon the subsequent opinion of the VE that the Plaintiff was capable of light and sedentary work (TR. 621).  In support of the requirement that VE testimony be "in response to a complete and accurate hypothetical question," the Plaintiff relies on *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir, 2004) and *Varley v. Secretary of Health and Human Servs.*, 820 F2d 777, 779 (6th Cir. 1987).  Specifically, the Plaintiff posits that the omission of her ability to "reach frequently but not constantly" from the hypothetical, as was otherwise noted by the ALJ in his findings, constituted reversible error.

*(1)* **Whether the ALJ's Hypothetical Question was inaccurate and incomplete**

As noted above, this court reviews the ALJ's decision to determine whether substantial evidence supports the finding that the claimant is not disabled. The Sixth Circuit has not held that a hypothetical must include all of the Plaintiff's limitations, so long as substantial evidence, which may include the testimony by the VE, supports the finding of the ALJ. *Foster v. Haller*, 279 F.3d 348, 356 (6th Cir. 2001) (upholding a district court's conclusion that the ALJ did not err by relying on the VE's testimony where that testimony did not include all of the limitations on the claimant's capabilities). *Webb* stands for the proposition that hypothetical questions to VEs are not required to include exhaustive lists of claimants' medical conditions. *Webb*, 368 F.3d at 633. *Varley* does state that substantial evidence provided for the ALJ by the VE in response to a hypothetical question must "accurately portray individual physical and mental impairments." *Varley*, 820 F2d at 779. However, in *Varley*, the Sixth Circuit upheld the ALJ's reliance on the VE's testimony where such testimony was predicated on a hypothetical which "omitted any reference to Plaintiff's ability to avoid noise[,] ability to cope with interpersonal contact, and . . . dizziness and hearing loss" when such testimony otherwise took into account "Plaintiff's limitations regarding exposure to noise and the need to minimize interpersonal contact." *Id.* at 780. Here, it appears that the omission was of similar quality to that in *Varley*, and, as such, the ALJ's reliance on the VE's response to the hypothetical does not disturb the substantial basis upon which the ALJ predicated his denial of SSI in this case.

*(2)* **Whether the ALJ properly utilized the vocational expert to determine Thompson's residual functional capacity.**

Plaintiff argues that because the ALJ relied on VE testimony that "mild low moderate level" pain would not interfere with jobs *already identified* by the VE as appropriate based on Plaintiff's physical limitations because they were "routine, repetitive, and [basically] entry level" (TR 28, 650), that such reliance invalidates the ALJ's decision (Motion at 18.). However, so long as substantial evidence regarding the Plaintiff's physical limitations were appropriately considered by the ALJ, an additional opinion rendered by the VE as to whether or not this type of pain would preclude a certain class of available jobs will not cause this court to overturn the ALJ's decision where is no indication that this was the sole testimony relied upon by the ALJ to support his finding against Plaintiff.

**B.    Whether the ALJ Erred in Failing to Find that Plaintiff's Obesity and Depression Were, Singly or in Combination, "Severe Impairments"**

A "severe" impairment is one that significantly limits a claimant's ability to do basic work activities. 20 C.F.R. § 416.920(c).  SSR 85-29 provides that an "impairment or combination of impairments" may be considered non-severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Further, although impairment that has no more than a minimal effect on an individual's ability to do basic work activities may not be considered severe, the Commissioner generally must consider the possibility that several such minimal impairments, considered together, may produce a severe impairment that must be considered.  *Id.*

The Plaintiff did not raise these issues of obesity or depression in her initial claim as a predicate or cause, alone or in combination with other factors, of her disability; neither did she raise them during the hearing, where she was represented by counsel (TR 610.).  In any event, it is clear that the ALJ considered these problems and assessed the degree to which the record indicated they interfered with Plaintiff's ability to work.  For the reasons set forth below, the Court finds that the ALJ's determination that the record did not support a finding that these impairments were "severe," whether considered singly or in combination, is supported by substantial evidence in the record.

**(1) Whether the ALJ Erred in Failing to find that Plaintiff's Depression, Singly or in Combination, was a "Severe Impairment"**

As to Plaintiff's claim of disabling mental impairment, in this case, depression, the Commissioner has promulgated a special technique to ensure that all evidence needed for the evaluation of such a claim is obtained and evaluated.  This technique was designed to work in conjunction with the sequential evaluation process set out for the evaluation of physical impairments.  20 C.F.R. § 404.1520a explains in detail the special procedure, and requires the completion of "a standard document outlining the steps of this procedure."  20 C.F.R. § 404.1520a(d).  Under this procedure, the Commissioner must first make clinical findings (*i.e.*, the "A" criteria) as to whether the claimant has a medically determinable mental disorder specified in one of eight diagnostic categories defined in the regulations.  *See* 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 12.00A.  Then the Commissioner must measure the severity of any mental disorder;

that is, its impact on the applicant's ability to work. This impart on the ability to work is assessed in terms of a prescribed list of functional restrictions associated with mental disorders (*i.e.*, the "B" criteria).

The ALJ's decision "must include a specific finding as to the degree of limitation" in the following "B" criteria areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a, 416.920a. However, an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-08 (6th Cir. Mich. 2006) (citing *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). "In sum, the ALJ's conclusions pertaining to the 20 C.F.R. §§ 404.1520a and 416.920a special technique can be adequately inferred from his overall discussion of Plaintiff's mental status." *Hunley v. Astrue*, 2008 U.S. Dist. LEXIS 41460, 17-18 (E.D. Tenn. 2008).

While those formal specific findings mandated by § 416.920a are absent in the decision below, the court finds the error to be harmless in this case. An administrative decision should generally not be reversed and remanded where doing so would be merely "an idle and useless formality." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citation omitted). Instead, the court must be able to discern at least some indirect support, such as where the ALJ's reasoning could be inferred from his overall discussion of the disputed condition. *Hunley,* 2008 U.S. Dist. LEXIS 41460 at 17-18 (citing *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 463 (6th Cir. 2005)).

Here the ALJ specifically noted in his RFC assessment that the Plaintiff was able to perform activities of daily living such as cooking, shopping, and riding the bus which he determined were not affected by her mental condition (Motion at 14 (citing TR 26.)). The ALJ also noted Plaintiff's abilities to socialize with relatives and attend church were unimpaired. (Id.) The ALJ further noted that the Plaintiff worked crossword puzzles which demonstrated her ability to concentrate and stay on task; finally, the failure of the Plaintiff to seek mental health treatment, along with the relative dearth of treatment regarding her depression, was probative of a lack of mental decompensation. Id.

With respect to the Plaintiff's depression, Plaintiff argues that she had a history of depression, dating back to diagnosis by Dr. Hobbs on March 13, 2003 (Motion at 8.), and that such depression

precludes her, alone or in concert with other infirmities, from working. Id. However, during her hearing before the ALJ on January 6, 2003, she responded that her emotional or mental status was "[a]ll right" (TR 620.) When responding to the same question, this time posed by her own attorney, at the second hearing on March 10, 2005, though the Plaintiff responded that her emotional or mental status was now "not good," she explained that she was taking Paxil (prescribed by Dr. Hobbs) to "calm her nerves," and admitted that she had never sought mental health treatment (TR 642.). There was no mention of depression by the Plaintiff, nor was this issue raised by her attorney at any time during either hearing, or anywhere in her application.

The Plaintiff relies primarily on the diagnosis of depression by Dr. Hobbs (TR 389, 484-86.), and her related prescription for Paxil (TR. 332, 348, 376, 389.) prescribed by Dr. Hobbs. There are, however, several problems with such reliance. First, the Plaintiff's vast medical history is otherwise devoid of references to the Plaintiff's depression and, absent representations made by Dr. Hobbs for purposes of litigation (TR 484-86.), gives no indication that the Plaintiff suffered from severe depression meriting analysis under § 416.920a. In fact, Dr. Hobbs' own medical records of the patient, prepared for treatment purposes, do not even list depression as part of his diagnosis (TR 393-146.). Second, while treatment at a mental health facility is not a *per se* requirement of finding a mental impairment, Dr, Hobbs' failure to refer her for treatment by a mental health professional or to diagnose her for depression, in combination with foregoing inconsistencies both in his medical determinations and the Plaintiff's own subjective complaints, provide substantial evidence from which the ALJ could determine that the Plaintiff's depression was not a mental impairment necessitating its subjection to the § 416.920a method.

The ALJ observed that Plaintiff's medical treatment record, regarding, inter alia, her overall mental health and depression, "does not provide a basis for significant limitations of function that lasted for a period of continuous 12 months" and that these are "minimal complaints of symptoms with minimal treatment" (TR 26.). Specifically, the ALJ noted that there was no attempt by the Plaintiff to seek counseling for her depression to be found anywhere on the record. *Id.* For the aforementioned reasons, this Court finds that those determinations by the ALJ were supported by substantial evidence on the record, including Plaintiff's own testimony at the hearings, and, as such, the ALJ's consideration of the Plaintiff's mental health was reasonable and does not constitute reversible error.

**_(2)_ Whether the ALJ Erred in Failing to find that Plaintiff's Obesity, Singly or in Combination, was a "Severe Impairment"**

Plaintiff asserts that the ALJ failed to follow the law at Step 2 because he failed even to mention Plaintiff's obesity, much less consider it. Plaintiff insists that failure to do so was in violation of SSR 00-3p, notwithstanding Plaintiff's own failure to raise her obesity as a qualifying disability anywhere in the record, including at either of her two appearances before the ALJ.

Moreover, the referenced Social Security Ruling simply clarifies how a finding of obesity may factor into a finding of disability, now that obesity _per se_ is no longer a listed impairment. The Ruling points out that some changes were made in other listings to ensure that obesity is still addressed in the listings. More specifically, paragraphs were added to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings to "provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems. _Id._ (citing Listings §§ 1.00F, 3.00I, and 4.00F). SSR 00-3p characterizes the added paragraphs as follows:

> The paragraphs state that we consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

_Id._

The simple fact is that none of Plaintiff's medical practitioners, including the treatment records by Dr. Hobbs, considered Plaintiff's obesity to be disabling. It is clear that the effect of her weight was taken into consideration both by her treating physicians and by the ALJ in determining whether her back or knee pain was disabling. The Plaintiff was not indicated to be otherwise suffering from any work-related impairments resulting from obesity, nor was there any claim or indication that such obesity significantly compounded her other impairments. The ALJ's failure to consider her obesity as an impairment, either singly or in combination was not an error where neither the medical record nor Plaintiff's own complaints gave him a reason to do so[1].

---

[1] It should also be noted that the Plaintiff, in her application for disability benefits, described herself as being 66 inches tall, not, as she now contends, 63 inches tall (TR 72.); such a height would require that the Plaintiff achieve and maintain, a weight of 186lbs for at least 12 months before being considered obese.

**C.  Whether the ALJ erroneously relied on medical opinions rendered in 2000 and 2001 for the entire period adjudicated; and the ALJ erroneously rejected treating pain specialist Dr. Hobbs' opinions**

The Plaintiff argues that the ALJ erred when he relied more heavily on the medical opinions of Drs. Keown and Bounds than that of Dr. Hobbs.  The Sixth Circuit has observed that even where the Commissioner's decision to reject a claimant's disability application is otherwise supported by substantial evidence, reversal will nonetheless be required if the agency fails to follow its own procedural regulation requiring the agency to " 'give good reasons' for not giving weight to a treating physician in the context of a disability determination."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary.  *Strunk v. Astrue*, 2009 U.S. Dist. LEXIS 33986 (E.D. Ky. Apr. 22, 2009) (citing *Hardaway v. Secretary*, 823 F.2d 922 (6th Cir. 1987)).

An ALJ generally is required give more weight to opinions from treating sources since "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).  Further, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion to be "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  *Id.*  The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.  20 C.F.R. § 404.1527(d).  *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985).  If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference.  *Miksell v. Comm'r of Soc.* Sec. No. 388, 2008 U.S. Dist. LEXIS 12913, at *21 (S.D. Ohio, June 12, 2008) (citing *Harris*, 756 F.2d at 435)).

If the opinion of a treating source is not accorded controlling weight, an ALJ must consider such factors as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.  *Id.*

The regulation also clearly requires the agency to always "give good reasons" in the ALJ's decision for the weight given the treating source's opinion." *Id.* "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that her physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating-physician rule and permits meaningful review of the ALJ's application of the rule. *Wilson*, 378 F.3d at 544–45 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

In addition, however, the Commissioner has interpreted its own rules in 20 C.F.R. §§ 404.1527(f) and 416.927(f) as requiring ALJs to consider the opinions of agency consultants "as opinions of nonexamining physicians and psychologists." SSR 96-6p. Specifically, ALJs are not "bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.*

In the present case, Plaintiff argues that the ALJ, in denying Plaintiff's claim, improperly rejected the opinions of her pain management specialist. Dr. Hobbs diagnosed low back pain with radiculopathy; degenerative joint disease of the knee; and anemia (Motion at 14 (citing TR 287-89.)). According to Dr. Hobbs, the Plaintiff's "pain interfered constantly with her ability to concentrate; she could not sustain an 8 hour workday; she needed to take unscheduled breaks; she could only stand for 10 minutes at a time; she could only sit for 10 minutes at a time; she could occasionally reach; and she would miss more than 4 days per month." (Motion at 14 (citing TR 483-86.). Furthermore, as addressed more fully supra, Dr. Hobbs diagnosed the Plaintiff with depression, and took into consideration all of her combined impairments when concluding she was disabled (Motion at 15 (citing TR 15.)).

Plaintiff insists that the ALJ, besides failing to give appropriate weight to Dr. Hobbs' opinions, did not give "good reason" for rejecting any of them. Plaintiff also alleges that the ALJ erred in relying on the medical assessments of Dr. Keown and Dr. Bounds, whose assessments diverged from that of Dr. Hobbs. As explained below, the Court nonetheless finds that the ALJ did not err in his treatment of these medical source opinions.

### *(1) The Weight Accorded Dr. Hobbs' Opinions*

The ALJ clearly stated in his opinion that the assessments by Dr. Hobbs were not given significant weight. The ALJ then went on to delineate the reasons for his departure from the normal deference which would have been accorded to a treating physician. First, the ALJ attacked the medical assessments rendered by Dr. Hobbs' as being (1) "conclusory;" and (2) "inconsistent with contemporaneously prepared treatment notes and reports from the same source" (TR 27.). The ALJ went on to surmise that "treatment notes and reports as to the estimates of pain are accepted as . . . more reliable and trustworthy than as a medical source statement only prepared for claim purposes" (TR 27-28.). Furthermore, the ALJ indicated that "[t]he claimant's presentation and level of independent functioning suggest an ability to perform at a higher level than described by Dr. Hobbs" (TR 28.). As to the qualifications of Dr. Hobbs and his pain management clinic to diagnose and treat mental disorders, the ALJ indicated that treatment by Dr. Hobbs was not commensurate with treatment "at a mental health facility" (TR 26.).

There is substantial evidence in the record to support the ALJ's findings that the medical assessments by Dr. Hobbs for purposes of litigation were not consistent with the doctor's own findings for purposes of treatment, and, in addition, that such assessments were not consistent with the record as a whole, including the Plaintiff's own subjective complaints and manifestations regarding the severity of her disability (which, like those of Dr. Hobbs, were plagued by inconsistencies). Accordingly, the Court finds that the ALJ's decision by the ALJ not to afford Dr. Hobbs' medical opinions complete deference was not reversible error, nor was his attendant determination to grant these same opinions little weight. Furthermore, the ALJ fulfilled his duty to provide the Plaintiff with adequate explanation as to why he did not accept her physician's disability determination. Finally, regarding the claim of disability resulting from depression, the ALJ found that Dr. Hobbs was not a specialist in psychiatric care. Moreover, the cursory language by Dr. Hobbs and his clinic regarding the derivative mental health benefits of improved pain management, does not require this court to disturb the ALJ's determination that Dr. Hobbs is not a mental health expert where there is substantial evidence on the record to support this conclusion. Under the circumstances, the ALJ was not required to give any weight to Dr. Hobbs' completely unsupported opinions. *See* SSR 96-6p.

### (2) The Weight Accorded to the Opinions of Drs. Keown and Bounds

Specifically, with regard to Plaintiff's ability to ambulate, Dr. Keown, the consulting physician, observed, on the basis of her examination conducted in December 2000, that Plaintiff was "capable of sitting 6 hours in an 8 hour day, during which time she could routinely lift 10lbs and episodically lift 20lbs" (TR 23.). Dr. Keown also found Plaintiff to have "full grip bilaterally." (*Id.*) This finding was entirely consistent with that of Dr. Bacon, an orthopedic surgeon, who diagnosed "mild degenerative disc disease," and referred the patient for physical therapy rather than proposing surgery (TR 139, 207.). During the prescribed physical therapy sessions, the therapist found that the Plaintiff's pain could be mostly ameliorated through therapy and improved posture (TR 23.). The testimony of a specialist like an orthopedic surgeon is entitled to greater deference when opining on medical diagnosis and prognosis within the compass of his expertise. 20 C.F.R. § 416.927(c)(5). Similarly, Dr. Keown, who is a specialist in psychiatry, described Plaintiff as only "moderately overweight" and found her "friendly and easy to examine" (TR 139, 335.). Dr. Keown made no mention of depression. The ALJ accorded Dr. Keown's opinion significant weight based upon her finding that it was "a comprehensive evaluation of claimant's physical impairments and consistent with the record as a whole" (TR 28.). The findings of Dr. Bounds, the State Agency medical examiner, were consistent with those of Dr. Keown, including no manipulative limitations, such as reaching, and limiting climbing, crouching, and crawling to "occasionally," but finding the Plaintiff could lift 20 pounds occasionally and stand, sit, or walk six out of eight (TR 142.).

While an ALJ is not bound by the determinations of state agency consultants, he must consider their opinions, and must explain the weight given to their determinations in rendering his opinion. Here, the ALJ clearly indicated the weight given the agency consultants by stating that "[c]onsideration has been given the opinions of the state agency consultants in accordance with Social Security Ruling 96-6p" and that the "assessment for light work activity is accepted as valid in that it is consistent with, and supported by, the evidence as a whole" TR (142.). It appears to the Court that this consistency of the consultant's testimony with the record extends even to the diagnosis and health updates prepared by Dr. Hobbs for purposes of treatment (TR 24), which reported great improvement in pain management, and little to no adverse reactions to the medication, and to the subjective statements by the Plaintiff herself regarding her medical condition (TR 26-27.).

**D.** **Whether the ALJ erred in failing to evaluate the side effects of Plaintiff's medication**

The Plaintiff's claims regarding the disabling side effects of her medication do not comport with the medical determinations and diagnosis present throughout the record. Even the Plaintiff's pain-management specialist, Dr. Hobbs, whose inconsistencies provided the ALJ with sufficient reason to discount his medical opinions, regularly observed that the Plaintiff suffered from no adverse side effects from her medication (TR 222, 409, 411, 415). The only exception is his note from an examination conducted on March 23, when the Plaintiff complained of "some drowsiness" (TR 401.). The ALJ did not err in by according little weight to Plaintiff's claim that the side effects of her medications were disabling.

**VI.** **CONCLUSION**

For the reasons discussed above, the Court finds that the ALJ applied the appropriate legal standards in reaching his conclusion, and that his decision is supported by substantial evidence in the record. An appropriate order denying Plaintiff's motion for judgment will be entered.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge